(Eddie) Jae K. Kim (CA Bar No. 236805)
**LYNCH CARPENTER, LLP**
117 East Colorado Blvd., Suite 600
Pasadena, CA 91105
Tel.:  (626) 550-1250
ekim@lcllp.com

*Attorneys for Plaintiff
and Proposed Class Counsel*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHAN TEAGUE, *individually and on behalf of all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> KENNAN & ASSOCIATES, <br><br> Defendant. | Case No.: 2:24-cv-1609 <br><br> **COMPLAINT – CLASS ACTION** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Nathan Teague ("Plaintiff") brings this Class Action Complaint, on behalf of himself and all others similarly situated, against Defendant Keenan & Associates ("Keenan" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to himself, which are based on personal knowledge:

**<u>NATURE OF THE ACTION</u>**

1.     Companies that handle sensitive, personally identifying information ("PII") or protected health information ("PHI") owe a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of PII or PHI to unauthorized persons—and especially hackers with nefarious intentions—will result in harm to the affected individuals, including, but not limited to, the invasion of their private health matters.

2.    The harm resulting from a data and privacy breach manifests in a number of ways, including identity theft and financial fraud, and the exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take a number of additional prophylactic measures.

3.    Kennan is an insurance brokerage firm that "provides innovative insurance and budgetary solutions for schools, public agencies and health care organizations" across the country.[1]

4.    In its ordinary course of business, Keenan knowingly obtains, collects, and stores individuals' PII and PHI. In turn, Keenan has a duty to secure, maintain, protect, and safeguard the PII and PHI that it collects and stores against unauthorized access and disclosure through reasonable and adequate data security measures.

5.    Keenan expressly acknowledges it duty to safeguard the PII and PHI entrusted to it, stating that Defendant "respects your privacy and takes our privacy responsibility very seriously and is committed to protecting it in a manner consistent with applicable law."[2]

6.    Despite Keenan's duty to safeguard individuals' PII and PHI, Plaintiff's and other individuals' PII and/or PHI was accessed and exfiltrated by a threat actor during a data breach of Defendant's network servers between August 21, 2023 and August 27, 2023 (the "Data Breach").[3]

7.    Despite the Data Breach occurring in August 2023, Keenan inexcusably waited approximately five months, until on or about January 26, 2024, to begin notifying impacted individuals of the Data Breach.

---

[1] *About Keenan*, Keenan, https://www.keenan.com/About (last visited Feb. 26, 2024).

[2] *Privacy Policy*, Keenan https://www.keenan.com/Privacy-Statement (last updated Jan. 2020).

[3] *Data Breach Notice*, Keenan (Jan. 26, 2024), https://www.documentcloud.org/documents/24389387-experian_k7150_keenanassociates_notice-letter?responsive=1&title=1.

8.      Based on the public statements of Keenan to date, a wide variety of PII and PHI was implicated in the Data Breach, including, but not limited to, names, dates of birth, driver's license numbers, Social Security Numbers, passport numbers, general health information, and health insurance information.[4]

9.      The Data Breach was a direct result of Keenan's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' PII and/or PHI. Defendant disregarded the rights of Plaintiff and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard PII and/or PHI; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to monitor and timely detect the Data Breach.

10.     As a result of Defendant's failure to implement and follow basic data security procedures, Plaintiff's and Class Members' PII and PHI is now in the hands of cybercriminals who wish to use it for nefarious purposes.

11.     As a result of Keenan's inadequate data security and a breach of its duties and obligations, Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, intrusion on their health privacy, and similar forms of criminal mischief, risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

12.     Plaintiff, on behalf of himself and all others similarly situated, alleges claims for negligence, negligence *per se*, unjust enrichment, and declaratory judgment, and seeks to compel Defendant to adopt reasonably sufficient security practices to safeguard the PII and PHI that remains in its custody in order to prevent incidents like the Data Breach from

---

[4]    *Notice of Security Incident*, Keenan  https://www.keenan.com/Notice-of-Security-Incident (last visited Feb. 26, 2024).

reoccurring in the future and to further provide Plaintiff and Class Members with credit monitoring services for the rest of their lives.

13.     To recover from Defendant for these harms, Plaintiff and the Class seek damages in an amount to be determined at trial, declaratory judgment, and injunctive relief requiring Defendant to: (1) disclose, expeditiously, the full nature of the Data Breach and the types of PII and PHI accessed, obtained, or exposed by the hackers; (2) implement improved data security practices to reasonably guard against future breaches of PII and PHI possessed by Defendant; and (3) provide, at its own expense, all impacted victims with lifetime identity protection services.

## PARTIES

14.     Plaintiff is an adult, who, at all relevant times, is and was a citizen of the State of California.

15.     Keenan is a California corporation, with a principal place of business located at 2355 Crenshaw Blvd., Suite 200, Torrance, CA 90501.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed Class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed Class, and at least one member of the proposed Class is a citizen of a state different than Defendant.

17.     This Court has personal jurisdiction over Defendant because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District, and Defendant resides in this District.

18.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

CLASS ACTION COMPLAINT

# FACTUAL BACKGROUND

**A.    Keenan Collected and Stored Plaintiff's and Class Members' PII and PHI.**

19.    Keenan "is an insurance brokerage company that provides insurance-related risk management and claims services through California and to clients across the country."[5]

20.    In the regular course of its business, Keenan collected and maintains the PII and PHI of Plaintiff's and Class Members for purposes of performing services for its clients.

21.    According to Keenan, the information collected and stored in its regular course of business includes:

- name, contact information, and other identifiers (real name, alias, address, unique personal identifier, online identifier, Internet Protocol (IP) address, email address, account name, Social Security Number, driver's license number, or other similar identifiers);

- personal identification documentation (Social Security Number, driver's license number, passport number, employee identification numbers, insurance policy number, bank account number, etc.);

- assets and income, occupation and employment status, dependent information and other relevant financial information;

- information related to the provision of services, such as policy information, claims information, and information relating to any past claims and related losses;

- information relating to account activity and premium payment history;

- information from reporting agencies and state and federal government agencies, such as state motor vehicle departments; and

- information from other sources, such as medical or health care providers and other third parties with which clients or Keegan maintain a relationship.[6]

---

[5] *Data Breach Notice*, *supra* note 3.
[6] *Privacy Policy*, *supra* note 2.

CLASS ACTION COMPLAINT

22.    Plaintiff and Class Members directly or indirectly entrusted Keenan with their sensitive and confidential PII and PHI and therefore reasonably expected that Defendant would safeguard their highly sensitive information and keep their PHI confidential.

23.    As a custodian of Plaintiff's and Class Members' PII and PHI, Keenan assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

24.    Even though Keenan states that it takes its privacy responsibility "very seriously," Defendant nevertheless employed inadequate data security measures to protect and secure the data with which it was entrusted, resulting in the Data Breach and the subsequent compromise of Plaintiff's and Class Members' PII and PHI.

**B.    Keenan Knew the Risks of Storing Valuable PII and PHI and the Foreseeable Harm to Victims**

25.    Keenan was well aware that the PII and PHI it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

26.    Keenan also knew that a breach of its computer systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII and PHI was compromised, as well as intrusion into their highly private health information.

27.    These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, and third-party providers, including OneTouchPoint, Inc., Connexin Software, Inc., and Blackbaud.

28.    PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace

for such commerce."[7] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

29.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[8]

30.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[9]

31.    The insurance industry has become a prime target for threat actors in recent years. Indeed, a Global Cyber Executive Briefing issued by Deloitte further found that "[c]yber-attacks in the insurance sector are growing exponentially" as cyber criminals have recognized that "insurers possess large amounts of personal information about their customers which is very attractive to identity thieves and fraudsters."[10] For example, in 2023 alone, multiple insurance companies were targeted by cyber criminals, including Sun Life, Pension Benefit Information, Prudential Insurance, new York life Insurance Companie, Genworth Financial, Managed Care of North America, and Havard Pilgrim Health Care.[11]

---

[7] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

[8] *Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/ (last visited Feb. 26, 2024).

[9] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Feb. 26, 2024).

[10] *Global Cyber Executive Briefing, Deloitte*, https://www2.deloitte.com/tw/en/pages/risk/articles/insurance.html (last visited Feb. 26, 2024).

[11] Stephen Lawton, *Insurance Companies Have a Lot to Lose in Cyber Attacks*, DarkReading (Oct. 4, 2023), https://www.darkreading.com/cyber-risk/insurance-companies-have-a-lot-to-lose-in-cyberattacks.

32.   In addition to storing wide swaths of personal information, insurance companies are also readily susceptible to cyber-attacks. Specifically, a 2022 report issued by Black Kite revealed that insurance companies have a high rate of vulnerability to ransomware with 82% of the largest insurance carriers being the focus of ransomware attacks and 82% of insurance companies also being vulnerable to phishing attacks. The report also found that 100% of the insurance underwriters surveyed indicated that ransomware and supply chain attacks were among their top-three biggest concerns from a threat standpoint.[12]

33.   The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves individuals especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

34.   **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security Numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

35.   The Social Security Administration even warns that the process of replacing a Social Security Number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

---

[12] *Cyber Insurance Risk in 2022*, Black Kite (2022), https://blackkite.com/wp-content/uploads/2022/04/Black_Kite_CyberInsurance_Report_2022.pdf.

If you receive a new Social Security Number, you should not be able to use the old number anymore.

For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[13]

36. Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often Social Security Numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes Social Security Numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

37. **Driver's License Numbers—**are highly sought after by cyber criminals on the dark web because they are unique to a specific individual and extremely sensitive. This is because a driver's license number is connected to an individual's vehicle registration, insurance policies, records on file with the DMV, places of employment, doctor's offices, government agencies, and other entities.

38. For these reasons, driver's license numbers are highly sought out by cyber criminals because they are one of the most valuable pieces of information to facilitate identity theft and fraud. This information is valuable because cyber criminals can use this information to open credit card accounts, obtain insurance policies and submit fraudulent claims, open cell phone contracts, file fraudulent tax returns, file unemployment applications, as well as obtain bank loans under a person's name.

39. Further, unlike credit or debit card numbers in a payment card data breach, which can quickly be frozen and reissued in the aftermath of a breach, the type of PII at stake here—unique driver's license numbers—cannot be easily replaced.

40. **Passport Numbers**—As explained by Aura, a leading identity theft protection service, "[p]assports are among the most widely accepted forms of identification, making them prime targets for scammers and fraudsters. If scammers steal

---

[13] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Feb. 26, 2024).

your passport number, they can impersonate you, create rake travel documents, or even open bank accounts in your name."[14] Indeed, when combined with other PII, such as a name, address, or picture, a "passport number enables scammers to impersonate you, access your online accounts, or target you in sophisticated scams that lead to identity theft."[15]

41.    Moreover, "[u]nlike credit card data or personal Social Security Numbers, there are few mechanisms in place to alert consumers that their passport numbers have been stolen and possibly used for fraud" making it difficult to determine if criminals are suing a forged or fraudulent passport in an individual's name.[16]

42.    **Medical Information**—As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[17] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[18]

43.    Indeed, medical records "are so valuable because they can be used to commit a multitude of crimes. Healthcare data can be used to impersonate patients to obtain expensive medical services, Medicare and Medicaid benefits, healthcare devices, and

---

[14] Yaniv Masjedi, *What Can Scammers Do With Your Passport Number?*, Aura (Apr. 12, 2023), https://www.aura.com/learn/what-can-someone-do-with-your-passport-number#:~:text=If%20scammers%20steal%20your%20passport,could%20still%20be%20at%20risk.

[15] *Id.*

[16] Kate Fazzini, *Here's how criminals use stolen passport information*, CNBC (July 5, 2019), https://www.cnbc.com/2019/07/05/how-criminals-use-stolen-passport-information.html.

[17] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last visited Feb. 26, 2024).

[18] *Managing cyber risks in an interconnected world, Key findings from The Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last visited Feb. 26, 2024).

prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[19]

44.     "In contrast to credit card numbers and other financial information, healthcare data has an incredibly long lifespan and can often be misused for long periods undetected. Credit card companies monitor for fraud and rapidly block cards and accounts if suspicious activity is detected, but misuse of healthcare data is harder to identify and can be misused in many ways before any malicious activity is detected. During that time, criminals can run up huge debts – far more than is usually possible with stolen credit card information."[20]

45.     According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage, or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[21]

46.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for

---

[19] Alder, *supra* note 14.

[20] *Id.*

[21] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited Feb. 26, 2024).

years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[22]

47.    **Health Insurance Information**—"stolen personal health insurance information can be used by criminals to obtain expensive medical services, devices and prescription medications, as well as to fraudulently acquire government benefits like Medicare or Medicaid."[23]

48.    Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII and PHI about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

49.    Based on the value of the PII and PHI in its possession to cybercriminals, Keenan knew, or should have known, the importance of safeguarding the PII and PHI entrusted to it and of the foreseeable consequences if its data security systems were breached. Keenan failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**C.    The Data Breach.**

50.    According to Keenan, on or about August 27, 2023, Defendant discovered disruptions on its network servers and began an investigation into the incident.[24]

---

[22] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf (last visited Feb. 26, 2024).

[23] Kate O'Flaherty, *Why cyber-Criminals Are Attacking Healthcare -- And How to Stop Them*, Forbes (Oct. 5, 2018), https://www.forbes.com/sites/kateoflahertyuk/2018/10/05/why-cyber-criminals-are-attacking-healthcare-and-how-to-stop-them/?sh=54e8ed1e7f69 (last visited Feb. 26, 2024).

[24] *Notice of Security Incident*, *supra* note 4.

51.    Keenan's investigation later confirmed that an unauthorized third-party had gained access to Keenan's internal systems multiple times between August 21, 2023, and August 27, 2023, and that the unauthorized third party had exfiltrated data from Keenan's systems.[25]

52.    Based on Keenan's notice, it is evident that the unauthorized actor accessed Defendant's computer systems and/or networks in an attack designed to acquire sensitive, confidential, and valuable PII and PHI stored therein, and that they were successful in the attack.

53.    A wide swath of individuals' PII and PHI was compromised in the Data Breach, including names, dates of birth, Social Security Numbers, driver's license numbers, passport numbers, general health information, and health insurance information.[26]

54.    Even though Keenan discovered the Data Breach on or about August 27, 2023, Defendant inexcusable waited approximately five months, until on or about January 26, 2024, to begin notifying individuals impacted by the Data Breach.[27]

55.    By failing to timely disclose the Data Breach, Keenan prevented victims from taking meaningful and proactive mitigation measures to protect themselves from harm.

56.    As a result of the Data Breach, the PII and PHI of approximately 1.5 million individuals—including Plaintiff and Class Members—was exfiltrated and is now in the hands of cybercriminals.[28]

57.    Plaintiff is informed and believes that the Data Breach occurred as a direct result of Keenan's failure to implement and follow basic security procedures in order to protect the PII and PHI in its possession.

---

[25] *Data Breach Notice*, *supra* note 3.

[26] *Notice of Security Incident*, *supra* note 4.

[27] *Data Breach Notifications*, Office of the Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/21846091-dc71-4ecc-9db8-a3be3e84a7d0.shtml (last visited Feb. 26, 2024).

[28] *Id.*

**D.      Keenan Failed to Comply with FTC Guidelines and Industry Best Practices.**

58.      Keenan is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act"), from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

59.      The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[29]

60.      In 2016, the FTC updated its publication titled Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.[30] The guidelines state that:

a.      businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

b.      businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

c.      businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

d.      businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

e.      businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.

---

[29] *Start with Security: A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited Feb. 26, 2024).

[30] *See Protecting Personal Information: A Guide for Business*, Federal Trade Commission, October 2016, available at https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Feb. 26, 2024).

61.    In another publication, the FTC recommended that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[31]

62.    Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act. Indeed, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

63.    Keenan was at all times fully aware of its obligations to protect the PII and PHI entrusted to it because of its position as an insurance broker, which gave it access to reams of PII and PHI. Keenan was also aware of the significant repercussions that would result from its failure to do so.

64.    Upon information and belief, Keenan failed to properly implement one or more of the basic data security practices recommended by the FTC. Keenan's failure to employ reasonable and appropriate data security measures to protect against unauthorized access to individuals' PII and/or PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

65.    Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[32]

---

[31] *See Start with Security: A Guide for Business*, Federal Trade Commission, June 2015, available at https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business (last visited Feb. 26, 2024).

[32] *See Framework for Improving Critical Infrastructure Cybersecurity*, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY (April 16, 2018), Appendix A, Table 2, available at https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf (last visited Feb. 26, 2024).

66.     NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[33] Keenan failed to adhere to the NIST guidance.

67.     Further, the International Association of Insurance Supervisors ("IAIS") has also issued guidance on cybersecurity measures those in the insurance sector can take, including the following measures:

    a.     establish and maintain a cybersecurity strategy and framework tailored to specific cyber risks and appropriately informed by international, national, and industry standard guidelines;

    b.     define and facilitate performance of roles and responsibilities for personnel implementing, managing, and overseeing the effectiveness of cybersecurity framework to ensure accountability;

    c.     identify functions, activities, products, and services to prioritize their relative importance, and access their respective cyber security risks in in order to identify and implement controls to protect against and manage those risks; and

    d.     establish systematic monitoring processes to rapidly detect cyber incidents and periodically evaluate the effectiveness of identified controls, including through network monitoring, testing, audits, and exercises.[34]

68.     Further, cybersecurity experts have identified various best practices that should be implemented by entities in the industry sector, including implementing the following measures:

    a.     implementing anti-malware and antivirus software to detect threats, along with firewalls to monitor and filter all traffic attempting to enter a network;

---

[33] *Id.* at Table 2 pg. 26-43.

[34] *Application paper on Supervision of Insurer Cybersecurity*, Int'l Ass'n of Insurance Supervisors (Nov. 2018), https://www.iaisweb.org/uploads/2022/01/181108-Application-Paper-on-Supervision-of-Insurer-Cybersecurity.pdf.

      b.     implementing artificial intelligence and machine learning to identify threats and respond to a cyber incident;

      c.     limiting access to sensitive data by minimizing people that have access credentials for confidential information;

      d.     implementing continuous monitoring; and

      e.     ensuring industry compliance.[35]

69.     Upon information and belief, Defendant's failure to protect massive amounts of PII is a result of its failure to adopt reasonable safeguards as required by the FTC guidelines, NIST guidance, IAIS guidance, and industry best practices.

70.     Keenan was well aware of its obligations to use reasonable measures to protect the PII and PHI in its possession. Keenan also knew it was a target for hackers, as discussed above. Despite understanding the risks and consequences of inadequate data security, Defendant nevertheless failed to comply with its data security obligations.

**E.    Plaintiff and Class Members Suffered Damages.**

71.     For the reasons mentioned above, Keenan's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members to suffer significant harm in several ways, including substantial and imminent risk of identity theft and fraud. Plaintiff and Class Members must immediately devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

72.     Once PII and PHI are exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for

---

[35] Kyle Chin, *How Cybersecurity Affects the Insurance Industry,* UpGuard (May 15, 2023), https://www.upguard.com/blog/how-cybersecurity-affects-the-insurance-industry

years, and possibly their entire lives, as a result of Keenan's conduct. Further, the value of Plaintiff's and Class Members' PII and PHI has been diminished by its exposure in the Data Breach.

73. As a result of Keenan's failures, Plaintiff and Class Members face an increased risk of identity theft, phishing attacks, and related cybercrimes because of the Data Breach. Those impacted are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

74. With respect to healthcare breaches, another study found "the majority [70 percent] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[36]

75. "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[37]

76. Indeed, PII and PHI are valuable commodities to identity thieves and once they have been compromised, criminals will use them and trade the information on the cyber black market for years thereafter. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account routing numbers can fetch up to $1,200 to $1,300 each on the black market.[38] According

---

[36] Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, HEALTHITSECURITY, https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud  (last visited Feb. 26, 2024).

[37] *Id.*

[38] Adam Greenberg, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC Media, (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market (last visited Feb. 26, 2024).

to a report released by the FBI's cyber division, criminals can sell healthcare records for 50 times the price of stolen Social Security Numbers or credit card numbers.[39]

77.    The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[40]

78.    Health information, in particular, is likely to be used in detrimental ways, by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[41]

79.    "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[42]

80.    Plaintiff and Class Members are also at a continued risk because their information remains in Keenan's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Keenan fails to undertake the necessary and appropriate security and training measures to the PII and PHI in its possession.

81.    Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers and their families, friends, and colleagues.

---

[39] Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf (last visited Feb. 26, 2024).

[40] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH, (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited Feb. 26, 2024).

[41] *Id.*

[42] *The Potential Damages and Consequences of Medical Identity theft and Healthcare Data Breaches*, EXPERIAN, https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited Feb. 26, 2024).

## F.    Plaintiff's Experience.

82.    Keenan was entrusted with Plaintiff's PII and PHI when providing brokerage services for Plaintiff's workers compensation insurance. In requesting and maintaining Plaintiff's PII and PHI, Keenan undertook a duty to act reasonably in its handling of Plaintiff's PII and PHI. Keenan, however, did not take care of Plaintiff's PII and PHI, leading to its exposure as direct result of Defendant's inadequate data security measures.

83.    Plaintiff received a notification from Defendant informing him that his PII and PHI he directly and/or indirectly provided to Keenan was compromised in the Data Breach. The letter put the onus on Plaintiff to protect his PII and PHI by encouraging Plaintiff to remain vigilant and recommending that he regularly review his financial accounts, report any suspicious or unrecognized activity immediate, and monitor his accounts.

84.    Since learning of the Data Breach, Plaintiff has been required to spend his valuable time and effort to mitigate his risk of future identity theft and fraud, including spending time researching the Data Breach and spending time changing his passwords to his financial and medical accounts.

85.    Plaintiff has suffered actual injury from having his PII and PHI exposed and/or stolen as a result of the Data Breach, including: (1) required mitigation efforts, including needing to monitor change his passwords to his financial and medical accounts to ensure his information is not used for identity theft and fraud; (b) damages to and diminution of the value of his PII and PHI, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) loss of privacy.

86.    In addition, knowing that hackers accessed and likely exfiltrated his PII and PHI and this information likely has been and will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

87.    As a direct and proximate result of the Data Breach, Plaintiff has been and will continue to be at a heightened risk for fraud and identity theft and its attendant damages

for years to come. Such a risk is real and certainly impending and is not speculative given the highly sensitive nature of the PII and PHI compromised in the Data Breach.

## CLASS ACTION ALLEGATIONS

88.    Plaintiff brings this class action on behalf of himself and all others who are similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

89.    Plaintiff seeks to represent the following Class of persons defined as follows:

> All individuals in the United States whose PII and/or PHI was compromised in the Keenan Data Breach which occurred between August 21, 2023 and August 27, 2023 (the "Class").

90.    Excluded from the Class are Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

91.    This proposed Class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the Class definition in an amended pleading or when he moves for Class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

92.    **Numerosity:** The members of the Class are so numerous that the joinder of all members is impractical. Plaintiff is informed and believes, and thereon alleges, that there are millions of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Keenan's records, including, but not limited to, the files implicated in the Data Breach, but based on public information, the Class includes approximately 1.5 million individuals. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

93.    **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

a.      whether Keenan had a duty to protect the PII and PHI of Plaintiff and Class Members;

b.      whether Keenan was negligent in collecting and storing Plaintiff's and Class Members' PII and PHI, and breached its duties thereby;

c.      whether Plaintiff and Class Members are entitled to damages as a result of Keenan's wrongful conduct; and

d.      whether Plaintiff and Class Members are entitled to restitution as a result of Keenan's wrongful conduct.

94.    **Typicality:** Plaintiff's claims are typical of the claims of Class Members. Plaintiff's and Class Members' claims are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and Class Members each had their PII and PHI exposed and/or accessed by an unauthorized third party.

95.    **Adequacy:** Plaintiff is an adequate representative of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the Class Members and has no interests antagonistic to the Class Members. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

96.    **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class Members is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

97.    **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by

comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class Member suffered damages by that conduct.

98. **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that generally apply to the Class making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

## FIRST CAUSE OF ACTION

### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

99. Plaintiff restates and realleges all proceeding allegations above as if fully set forth herein.

100. Keenan owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and/or PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. More specifically, this duty including, among other things: (a) designing, maintaining, and testing its security systems to ensure that Plaintiff's and Class Members' PII and/or PHI in Keenan's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

101. Keenan's duty to use reasonable care arose from several sources, including, but not limited to, those described below.

102. Keenan had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing valuable PII/PHI that is routinely targeted by cyber-criminals for unauthorized

access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

103.    Keenan also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiff and Class Members. Keenan's conduct included its failure to adequately restrict access to its computer networks that held individuals' PII and PHI.

104.    Keenan also knew or should have known of the inherent risk in collecting and storing massive amounts of PII and PHI, the importance of implementing adequate data security measures to protect that PII and PHI, and the frequency of cyberattacks such as the Data Breach in the insurance sector.

105.    Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. Defendant breached these duties by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its clients; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

106.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and/or PHI would not have been compromised.

107.    As a direct and proximate result of Keenan's negligence, Plaintiff and Class Members have suffered injuries, including: (a) actual identity theft; (b) the loss of the

opportunity how their PII and/or PHI is used; (c) the compromise, publication, and/or theft of their PII and/or PHI; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII and/or PHI; (e) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their PII and/or PHI, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII and/or PHI in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII and/or PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

108.   As a direct and proximate result of Keenan's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

109.   Plaintiff restates and realleges the allegations above as if fully set forth herein.

110.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities, such as Keenan, for failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of Defendant's duty.

111.   Keenan violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and PHI; not complying with the industry standards; and failing to timely notify Plaintiff and Class Members of the Data Breach. Defendant's conduct was particularly unreasonable given the nature and amount of PII and PHI it obtained and stored

and the foreseeable consequences of a data breach involving PII and PHI obtained from its clients when providing insurance brokerage services.

112.    Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

113.    The harm that has occurred as a result of Keenan's conduct is the type of harm that the FTC Act was intended to guard against.

114.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

115.    As a direct and proximate result of Keenan's negligence, Plaintiff and Class Members have suffered injuries, including: (a) actual identity theft; (b) the loss of the opportunity how their PII and/or PHI is used; (c) the compromise, publication, and/or theft of their PII and/or PHI; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII and/or PHI; (e) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their PII and/or PHI, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII and/or PHI in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII and/or PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

116.    As a direct and proximate result of Keenan's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, damages in an amount to be proven at trial.

# THIRD CAUSE OF ACTION

## DECLARATORY JUDGMENT
### (Plaintiff on behalf of the Class)

117.    Plaintiff restates and realleges all preceding allegations set forth above as if fully alleged herein.

118.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et. seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Class Action Complaint.

119.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI and whether Keenan is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of his PII and PHI and remains at imminent risk that further compromises of her PII and/or PHI will occur in the future.

120.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that, among other things:

a.    Keenan owed a legal duty to secure individuals' PII and PHI under the common law and Section 5 of the FTC Act; and

b.    Keenan breached and continues to breach this legal duty by failing to employ reasonable measures to secure individuals' PII and PHI.

121.    This Court also should issue corresponding prospective injunctive relief requiring Keenan to employ adequate security protocols consistent with law and industry standards to protect Plaintiff's and Class Members' PII and PHI.

122.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach

at Keenan. The risk of another such breach is real, immediate, and substantial. If another breach at Keenan occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

123.    The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Keenan if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Keenan of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Keenan has a pre-existing legal obligation to employ such measures.

124.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Keenan, thus eliminating the additional injuries that would result to Plaintiff and Class Members, whose confidential information would be further compromised.

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff demands a trial by jury as to all issues so triable in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all other similarly situated, prays for relief as follows:

A.    for an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.    for an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C.    for compensatory damages on behalf of Plaintiff and the Class;

D.    for punitive damages on behalf of Plaintiff and the Class;

E.    for an order of restitution and all other forms of equitable monetary relief;

F.     declaratory and injunctive relief as described herein;

G.     for disgorgement and/or restitution as the Court deems appropriate, just, and proper;

H.     awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

I.     awarding pre- and post-judgment interest on any amounts awarded;

J.     for reimbursement for all costs and expenses incurred in connection with the prosecution of these claims; and

K.     awarding such other and further relief as may be just and proper.

Dated: February 27, 2024          **LYNCH CARPENTER, LLP**

By:  */s/ (Eddie) Jae K. Kim*
     (Eddie) Jae K. Kim (CA Bar No. 236805)
     117 East Colorado Blvd., Suite 600
     Pasadena, CA 91105
     Tel.:  (626) 550-1250
     ekim@lcllp.com

     *Attorneys for Plaintiff*
     *and Proposed Class Counsel*